Alice S. LOGAN and Edward F. Logan,
Appellants,

v.

GROUP HEALTH ASSOCIATION, INC.,
Appellee.

No. 2786.

Municipal Court of Appeals for the
District of Columbia.

Argued July 17, 1961.

Decided Sept. 15, 1961.

Stanley R. Jacobs, Washington, D. C.,
for appellants.

John J. Sexton, Washington, D. C., for
appellee.

Before HOOD and QUINN, Associate
Judges, and SMITH, Chief Judge of The
Municipal Court for the District of Colum-
bia, sitting by designation.

SMITH, Judge.

This is an appeal from a judgment entered
on a trial finding for Group Health Asso-
ciation, Inc., in a suit by two of its mem-
bers to recover the costs of medical and
hospital expenses. Appellee is a nonprofit
membership corporation organized for the
purpose of providing medical, surgical and
hospitalization services to its members and
their dependants.[1]

In November 1953 appellants' applica-
tion was accepted for membership in the
Association. The application, which was
signed by Mr. Logan, stated that applicants
were to be bound by the by-laws. The fol-

1. McIntosh v. Group Health Association,
D.C.Mun.App., 138 A.2d 496; Group
Health Ass'n v. Shepherd, D.C.Mun.App.,
37 A.2d 749.

lowing provisions of said by-laws are material to appellants' claim:

"Article IV, Section 2 of the 1956 by-laws (amending Article IV, Section 5 of the 1954 by-laws). The manner in which any services of the Association shall be made available in each individual case to any member or listed dependent shall be determined and prescribed by the Medical Director or his representative. No service, other than that provided by the staff, shall be procured for any member or listed dependent, except in accordance with policies established by the Medical Director. The Association shall have no obligation to pay for hospitalization or other services procured by or on behalf of a member or his listed dependent that is not authorized or approved by the Medical Director.

"Article IV, Section 4 of the 1956 by-laws (amending Article IV, Section 7 of the 1954 by-laws). The Association shall, upon the recommendation of the Medical Director, impose restrictions on services, including hospitalization, for conditions, which in his opinion, existed prior to admission to membership for members or listed dependents enrolled by the individual admission procedure. The Association will provide consultation and treatment with respect to restricted conditions at the medical center with the Association's medical staff to members and their listed dependents after they have participated in membership for a period of one year. * * * Notification of all restrictions shall be in writing and shall apply retroactively to the date of admission to, or reactivation of, membership. Restrictions once imposed, shall apply until the member receives written notification from the Medical Director that they have been removed. All acute conditions existing at the time the applicant's final acceptance of membership has been received

will automatically be restricted. The restriction will continue in effect for the duration of the illness."

In January 1954 Dr. Henry H. Lichtenberg, Medical Director of the Association, advised Mrs. Logan that her membership was restricted as follows: "Fibroid uterus, pending final diagnosis." Mrs. Logan agreed to this restriction. On several occasions during the period 1954–1958, Mrs. Logan was examined in relation to this restriction by physicians associated with appellant. Although she was not notified of any abnormality, the restriction was not removed. In December 1958 she was informed by Dr. Brennan, a staff doctor of the Association, that a hysterectomy would be necessary. Mrs. Logan testified that Dr. Brennan recommended that she consult another physician to verify his opinion and that she assumed he meant any doctor, either a member or non-member of the Association. She further testified that the operation was performed by a non-member physician and that the Association did not indicate in any way that it would pay for the operation.

Dr. Lichtenberg testified the restriction, "Fibroid uterus, pending final diagnosis," meant that since the presence of tumors within the uterus could not be discovered under ordinary examination until they grew larger, it was impossible to know whether the condition in the uterus resulted from tumors until the uterus was removed; and that if after the uterus was removed it was discovered that the condition was not caused by tumors, the restriction would not apply. Dr. Lichtenberg further stated that Mrs. Logan never requested authorization to retain someone other than a staff doctor; that it is the policy of the Association not to use doctors outside of the staff if there are qualified doctors within the organization and that there were at the time several physicians on the staff qualified to perform a hysterectomy. Dr. Brennan in his testimony referred to the difficulty involved in determining whether there is a fibroid uterus

by physical examination. He further stated that "Fibroid uterus, pending final diagnosis" in this context meant a diagnosis after surgery.

■ Bringing this case here for review, appellants first contend that the trial court should have found that appellee was under a duty to secure medical attention for Mrs. Logan outside the Association at a reduced rate and then look to appellants for reimbursement. In support of this argument, appellants rely on Group Health Ass'n v. Shepherd, D.C.Mun.App., 37 A.2d 749. This case has no application to the present situation. There this court was construing a section of the by-laws not present in the by-laws now under consideration. The language of Article IV, Section 2 of the 1956 by-laws, controlling here, clearly indicates that the Association is under no obligation to pay for hospitalization or other services obtained outside the staff of the organization, absent authorization from the Medical Director. No such authorization was ever given.

■ Secondly, appellants contend that the requirement of the written notification for the removal of a restriction as provided for in Article IV, Section 4 of the 1956 by-laws was waived by the failure of the Association to find an abnormality in the uterus during examinations. They argue that the language of the restriction, "Fibroid uterus, pending final diagnosis," means that if the examinations of Mrs. Logan revealed a normal condition in the uterus, the restriction should have been removed and that failure by the Association to do so constituted a waiver of the requirement of written notice as provided for in the by-laws. We cannot adopt this position. In the light of the testimony of Dr. Lichtenberg and Dr. Brennan relative to the difficulty in discovering a fibroid uterus by physical examination, we are of the opinion that the only reasonable interpretation of the restriction "Fibroid uterus, pending final diagnosis" must be that an operation is contemplated before a final diagnosis can be made.

In view of the dissent, we believe we should add the following: This case would probably be one of the easiest to reverse on a sympathy basis, but it must be decided upon its legal merits. This the majority has attempted to do. The dissent makes absolutely no reference to Article IV, Section 2 of the by-laws of the Association set forth above. Since appellee did not authorize outside medical care as provided for in the by-laws and the restriction could not be removed until surgery was performed, we must

Affirm.

HOOD, Associate Judge (dissenting).

It is my opinion that appellants are not bound by the restriction because of its misleading and meaningless wording. When Dr. Lichtenberg, the medical director of the Association and the person who put the restriction on the membership, was asked by the trial court to state the meaning of "pending final diagnosis" he began his answer in this fashion: "Well, I—this, Sir, is not"; and he then floundered on through several pages of testimony in an unsuccessful attempt to give an intelligent answer. At one time he said, "it's a legal expression" and at another time he said, "this thing was meant to alert the doctors." Finally the trial court in an attempt to get some specific answer, asked: "But, now, when was the final diagnosis made?" The doctor's reply was: "Well, there wasn't any final diagnosis made in this case."

Dr. Brennan, a staff doctor of the Association, testified: "Well, final diagnosis in an instance of this nature cannot be made until the organ has been removed and a pathological examination done of the organ." When asked, "After the operation you made a diagnosis?", he replied, "It would be made—actually, it is a pathological examination."

It seems quite plain to me that although the restriction purported to be "pending final diagnosis," the Association had no intention of making a final diagnosis. The position of the Association appears to be that there was an absolute restriction, without condition of any kind, on an operation resulting from a fibroid uterus; but instead of stating the restriction in unequivocal terms, it added the misleading words, "pending final diagnosis."

To the lay mind at least, a diagnosis is something which precedes an operation and does not occur after the operation has been performed. I understand Dr. Brennan to agree with this, because in effect he said that what took place after the operation was not a diagnosis but was a pathological examination. I think Mrs. Logan was justified in believing, as she said, that the final diagnosis would be made after she had been examined by the staff doctors. Several such examinations were made and the organ was found normal, and since she received no notice of any "final diagnosis" she assumed it had been made and was favorable to her. Five years after her application she was told in effect that no final diagnosis had been made and none would be made.

Finally, and to illustrate what appears to me to have been the attitude of the Association throughout the whole matter, after the hysterectomy had been performed by Dr. Leonard, the Association, through Dr. Lichtenberg, informed Mrs. Logan that the restriction for "fibroid uterus, pending final diagnosis" had been removed from her membership. What possible advantage would it be to her to have the restriction removed after the uterus had been removed?

I think the purported restriction was misleading and ineffectual and the Association should not be allowed to rely on its own by-laws to relieve it from its own deception. I would reverse and order judgment for appellants.